**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| REBECCA SUSSMAN, *Plaintiff,* v. AXONIUS, INC, *et al.*, *Defendants.* | Civil Action No. 23-01822 (AHA) |

**Memorandum Opinion and Order**

Rebecca Sussman sues Axonius, Inc. and one of its subsidiaries, claiming they interfered with her right to take leave under the Family and Medical Leave Act and D.C. Universal Paid Family Leave Amendment Act and fired her in retaliation for attempting to take leave under those Acts. She also claims they fired her in retaliation for engaging in activity protected by Title VII and the D.C. Human Rights Act. The companies move for summary judgment, arguing they had a legitimate, nonretaliatory reason to terminate Sussman and did not otherwise interfere with her rights. For the reasons below, the court grants the companies' motion in part and denies it in part.

## I.    Background[1]

Axonius, Inc., hired Sussman as in-house counsel in September 2020. ECF No. 33-1 ¶¶ 11–12. The company's corporate counsel, Edy Glozman, supervised Sussman's work and met with her about once a week to give feedback. *Id.* ¶¶ 22, 29, 176–77.

---

[1]    As required at this stage, the court considers the evidence in the light most favorable to Sussman and draws all reasonable inferences in Sussman's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

It is undisputed that Glozman started raising issues with Sussman's performance early in her tenure. About a month after Sussman started at Axonius, Glozman described her work product as "sloppy" and expressed concern about her "lack of attention to detail" and "failure to learn and apply comments previously communicated." *Id.* ¶ 31. Glozman also told Sussman "she should drastically improve to live up to the goal of being able to run solo with the contracts" he assigned to her. *Id.* ¶ 32. Sussman herself recognized she was improving at a slower rate than expected. *Id.* ¶ 33. And she apologized to Glozman multiple times for issues related to her work product. *Id.* ¶¶ 35–36. At the same time, Glozman acknowledged positive feedback from others who worked with Sussman. ECF No. 37 ¶ 179.

Glozman continued to raise performance issues over the following year, and Sussman continued to acknowledge them. In April 2021, Glozman gave Sussman more negative feedback about her performance, ECF No. 33-1 ¶¶ 37–39, and in July, Sussman recognized she was not performing to her "usual standard," *id.* ¶ 41. Glozman noted that "unfortunately based on her track record here it seems that her usual professional standard is not as high as I would expect for her role." *Id.* ¶ 43. In Sussman's 2021 performance review, Glozman spoke with her about issues with contract drafting and attention to detail and told her she had to improve in several areas. *Id.* ¶¶ 44–46. Glozman again also noted positive aspects of her work, including that she was a dedicated employee and team player who others enjoyed working with. *Id.* ¶¶ 190–94.

Sussman testified in her deposition that she attended a company retreat in May 2022 where an employee made an offensive and unwelcome sexual advance, asking Sussman if he could "suck on [her] toes." *Id.* ¶ 294. According to Sussman, she reported the incident to a human resources employee, but the company did not investigate the incident. *Id.* ¶¶ 296, 298.

Sussman's performance review for 2022, like her earlier feedback, was mixed. In addition to positive feedback about being a team player, taking her work seriously, moving projects along, being receptive to feedback, acknowledging mistakes, working hard to improve, and improving in her technical legal skills, Glozman identified mistakes Sussman had made and told Sussman she was not performing "at the level appropriate for [her] experience." *Id.* ¶ 56; *see id.* ¶¶ 205–08. Glozman gave Sussman a middle rating for her performance. *Id.* ¶¶ 209–13. After the review, Glozman gave Sussman more negative feedback, telling her that her "core skills as a commercial attorney are not close to what we need" and "I don't see you moving up here." *Id.* ¶ 61.

In December 2022, Sussman began exploring the possibility of taking leave to serve as a caretaker for her ill mother. *Id.* ¶ 124. When Sussman told Glozman about her mother's health issues, Glozman referred her to HR and said to let him know if he could be helpful. *Id.* ¶ 125. Sussman reached out to HR the same day to ask about leave options and, a few days later, HR told Sussman she was entitled to intermittent, unpaid leave under the Family and Medical Leave Act and provided Sussman a leave form. *Id.* ¶¶ 126–29. Sussman reached out to HR again about a month later for information about taking leave, and Glozman followed up with HR, too, to make sure that Sussman received a response. *Id.* ¶ 131. HR responded the next day to tell Sussman she was eligible for leave under the D.C. Paid Family Leave program and could use vacation and sick time as well. *Id.* ¶¶ 132–33. Sussman expressed appreciation and said she was still weighing her options. *Id.* ¶ 134. When HR followed up with Sussman a couple of days later, Sussman reported that she "no longer (fingers crossed) need[ed] to take extended leave," having found a caregiver for her mother. *Id.* ¶ 135; *see id.* ¶ 235. Although the caregiver situation did not work out, Sussman continued working over the ensuing weeks without taking any additional steps to request leave. *Id.* ¶¶ 136, 235.

In January 2023, Glozman met with HR and shared his intent to terminate Sussman. *Id.* ¶ 64. He followed up the next week with supporting materials for HR to draft a justification for the termination. *Id.* ¶ 65. While Glozman was waiting for the termination to be finalized by HR, he confronted Sussman about more perceived mistakes, and Sussman apologized for one of them. *Id.* ¶¶ 66–73. Sussman then said she would "apply for family leave so she can regroup and return to work as expected." *Id.* ¶ 139. Sussman contacted HR to revisit taking leave and created an account with D.C.'s Paid Family Leave Office. *Id.* ¶¶ 140-41.

In the days that followed, Glozman's request to terminate Sussman for underperformance moved up the approval chain, while Sussman took actions to pursue family leave. At each level of approval for the termination, HR noted that Sussman had requested a leave of absence, stated she could continue to take leave as needed, and recommended the company allow her to remain on the payroll for a time in light of her family circumstances. *See id.* ¶¶ 142–43; ECF No. 37 ¶¶ 240–41. In one message, an HR employee told other HR personnel, including the head of HR, "we are opting to allow [Sussman] to remain on staff due to her current situation with her family" and that Sussman "has requested a leave of absence, which she can continue to take as needed." ECF No. 31-7 at 35. That employee also emailed the CEO, saying that Sussman "has experienced ongoing personal matters making it difficult to manage performance," recommending Sussman be allowed to "remain on staff for 3 months" and be offered "a generous package of 3 months severance due to her ongoing personal situation with her family," and noting Sussman "has requested a leave of absence, which she can continue to take, as needed." ECF No. 31-3 at 183. Meanwhile, Sussman submitted her claim to D.C.'s Paid Family Leave Office. ECF No. 33-1 ¶ 249.

After the CEO signed off on the termination, Glozman and an HR employee told Sussman she was terminated. *Id.* ¶ 83. Glozman told Sussman he had lost confidence in her ability to

overcome her performance issues. *Id.* ¶ 84. After Axonius terminated Sussman, the D.C. Office of Paid Family Leave told her she was eligible to receive benefits, which she received. *Id.* ¶ 147. Sussman declined the company's severance offer and remained on the company's payroll through March 15, 2023. *Id.* ¶ 89; ECF No. 37 ¶ 251.

In June 2023, Sussman sued Axonius, Inc., and its subsidiary Axonius Federal Systems, LLC. *See* ECF No. 1. She asserts claims under the Family and Medical Leave Act ("FMLA"), D.C. Universal Paid Family Leave Amendment Act ("UPLA"), D.C. Human Rights Act ("DCHRA"), and Title VII. *See* ECF No. 45 ¶¶ 63–113. After discovery, the companies now move for summary judgment on those claims. ECF No. 31.[2]

## II.    Discussion

Summary judgment is proper when the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The party opposing summary judgment must point to evidence that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2]    The companies also moved for summary judgment on claims under the D.C. Family Medical Leave Act and Equal Pay Act, but Sussman has since amended her complaint to withdraw those claims. *See* ECF Nos. 35, 45.

The companies argue they are entitled to summary judgment on all of Sussman's claims. The court addresses each claim in turn.

### A. No Reasonable Jury Could Find That Sussman Was Fired Because She Asked For Leave

Sussman claims that both Axonius, Inc. and its subsidiary violated the FMLA by firing her in retaliation for, and in interference with, her attempt to exercise her right to take leave. She also claims that Axonius violated the UPLA by firing her, on the same retaliation and interference theories. The companies argue the unrebutted evidence shows Sussman was fired because of her performance, and not because she asked for leave. The court agrees—Sussman has not shown there is a genuine and material issue that Axonius fired her because she wanted to take leave.[3]

The FMLA and UPLA make it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's right to take leave under those statutes. 29 U.S.C. § 2615(a)(1); *see* D.C. Code § 32-541.10(a). The D.C. Circuit has held this language in the FMLA allows a plaintiff to bring a retaliation claim when they can show that an employer took an adverse action against them because they requested leave, and that such claims are analyzed under the *McDonnell Douglas* framework. *See Waggel v. George Washington Univ.*, 957 F.3d 1364, 1375–76 (D.C. Cir. 2020). The parties agree the UPLA also allows this type of retaliation claim and that courts analyze it under the same framework. *See* ECF No. 31 at 24; ECF No. 33 at 19; *see also* D.C. Code § 32-541.10(b)(2)(D). Under the *McDonnell Douglas*

---

[3]   For simplicity, the court refers only to Axonius, Inc., or "Axonius"—the company that undisputedly employed Sussman—throughout its analysis. ECF No. 33-1 ¶ 12. Although Sussman asserts her FMLA claims against Axonius and its subsidiary on a theory they were an "integrated employer" under FMLA regulations, the court grants summary judgment to the companies on the merits of those claims. The UPLA claim, which survives in part, is asserted against only Axonius. *See* ECF No. 45 ¶ 72 (asserting the companies are an "integrated employer" for her FMLA claim (citing 29 C.F.R. § 825.104(c)(2)); ECF No. 33 at 37–39 (arguing the "integrated employer" theory only as to the FMLA claims).

framework, once an employer proffers a legitimate, nonretaliatory reason for the adverse action, the question at summary judgment "is whether the employee's evidence creates a material dispute" of fact as to the reason for the action, which can be done "either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (cleaned up).

On the record that has developed here, Sussman has not shown a genuine and material issue as to whether she was fired for requesting leave, rather than because of her performance. The uncontroverted evidence shows that Glozman, the person who decided to fire Sussman, had long documented Sussman's performance issues, including by noting that her work was "sloppy" within the first few months; expressing concern about her "lack of attention to detail" and "failure to learn and apply comments previously communicated"; concluding within the first year that Sussman's "usual professional standard is not as high as I would expect for her role"; and telling Sussman a couple months before firing her that her "core skills as a commercial attorney are not close to what we need" and he did not "see [her] moving up" at the company. ECF No. 33-1 ¶¶ 31, 43, 61; *see also id.* ¶¶ 33, 35–36 (showing Sussman acknowledged her underperformance and failure to improve on multiple occasions). All this happened before Sussman first inquired about leave in December 2022. *See id.* ¶ 124. In addition, the record shows Glozman was openly supportive of Sussman's request to take leave, *id.* ¶ 125, and, at the time he made the decision to fire her, Sussman had told Axonius she "no longer (fingers crossed) need[ed] to take extended leave," *id.* ¶ 135; *see id.* ¶ 235. In other words, at the time Glozman decided to fire her, there was not even a pending request for leave despite Glozman's open willingness to support her in seeking leave. On these facts, there is no genuine and material issue that Glozman made the decision to terminate

Sussman based on underperformance (something that had been long documented) rather than for seeking leave (something that she had indicated would no longer be necessary). *Id.* ¶ 64.[4]

Sussman says she has evidence from which a reasonable jury could find that she was fired for requesting leave, and that Axonius' performance-based justification was pretext, but she does not. Sussman first points to communications written after Glozman decided to fire her, in which HR personnel mentioned that Sussman had previously requested leave. *See id.* ¶¶ 142–43 (describing message from HR employee to other HR personnel mentioning Sussman's leave request); ECF No. 37 ¶¶ 240–41 (describing email from HR employee to CEO mentioning Sussman's request for leave). But these comments were not made by a decisionmaker, and they were made after Glozman decided to fire Sussman. *See Waggel*, 957 F.3d at 1374 (concluding comment by non-decisionmaker that plaintiff "had taken 'too much sick leave'" was "insufficient to raise a genuine issue of material fact regarding pretext" because "stray remarks by non-decisionmakers are not generally direct evidence of discrimination"). And Sussman's characterization strips these mentions from their context: in the relevant communications, the HR employee acknowledged Sussman's earlier inquiry about leave not as a basis for firing her, but to suggest that the company still give Sussman leave despite the decision to fire her. *See* ECF No.

---

[4] Sussman argues that Glozman's notes about her performance are hearsay. *See, e.g.*, ECF No. 33-1 ¶ 43. At summary judgment, evidence is properly considered if it is "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). The statements at issue are not hearsay insofar as they are offered to show Glozman's motive—that he acted with a legitimate purpose—rather than for the truth of Sussman's performance. *See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008). Insofar as the statements would be offered for their truth, they would be admissible as business records. *See* Fed. R. Evid. 803(6); *Panarello v. Bernhardt*, No. 17-cv-02103, 2021 WL 86766, at *5 n.7 (D.D.C. Jan. 11, 2021). Even to the extent particular notes are not admissible, they could likely be converted into an admissible form at trial—for example, through Glozman's testimony. *See Richards v. Option One Mortg. Corp.*, No. 08-cv-0007, 2009 WL 2751831, at *1 n.3 (D.D.C. Aug. 28, 2009).

31-7 at 35 (noting Axonius was "opting to allow [Sussman] to remain on staff due to her current situation with her family," that "[s]he has requested a leave of absence, which she can continue to take as needed," and that "[w]e also want to help her during this time by offering a generous severance package"); ECF No. 31-3 at 183 (acknowledging Sussman "requested a leave of absence, which she can continue to take, as needed" and recommending she "remain on staff for 3 months" and be offered "a generous package of 3 months severance due to her ongoing personal situation with her family").

Sussman, second, says there is a triable issue as to whether she was fired because of her leave request because other employees were also fired for seeking or taking leave. *See* ECF No. 33 at 29–33. In determining whether this type of evidence, sometimes called "me too" evidence, raises a genuine and material factual dispute, courts consider "whether such past discriminatory behavior by the employer is close in time to the events at issue in the case, whether the same decisionmakers were involved, whether the witness and the plaintiff were treated in a similar manner, and whether the witness and the plaintiff were otherwise similarly situated." *Nuskey v. Hochberg*, 723 F. Supp. 2d 229, 233 (D.D.C. 2010); *see Parker v. Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 30–31 (D.D.C. 2016) (analyzing these factors to evaluate whether plaintiff "raise[d] an inference of pretext sufficient to survive summary judgment"), *aff'd*, 696 F. App'x 522 (D.C. Cir. 2017).

Here, the "me too" evidence does not raise a genuine and material issue. Sussman points to two other employees who were fired around a similar time, but both worked in different departments than her and were fired by different supervisors than her. *See* ECF No. 33-1 ¶¶ 262–63, 282, 287–88; ECF No. 37 ¶ 279. There is no evidence indicating that those employees were similarly situated in terms of performance issues. One was terminated as part of a group of 17

9

employees, and none of the other fired employees had taken leave. ECF No. 36 at 15; ECF No. 39-1 ¶¶ 4–6. The second employee was fired due to "organization restructuring" that eliminated their position. ECF No. 37 ¶ 279. The parties dispute whether HR dissuaded one of the employees from applying for FMLA leave. *Compare* ECF No. 33-27 ¶¶ 6–7 (attesting that an HR employee "tried to dissuade [him] from applying formally for FMLA leave"), *with* ECF No. 36-5 at 4–6 (providing screenshots of a conversation between HR personnel and the employee showing HR assisted him in applying for FMLA leave). But in any event, it is uncontested that HR told Sussman she had a right to take FMLA leave and provided her with the form to request it. *See* ECF No. 33-1 ¶¶ 124–30. Accordingly, Sussman's "me too" evidence does not raise an inference of pretext.

Sussman, third, argues a reasonable jury could find Axonius fired her because of her leave request because, although Glozman decided to fire her during a window when she represented she no longer planned to take leave, Sussman later changed her mind and renewed her request for leave the day before the company told her she was fired. *Id.* ¶¶ 135, 220, 231, 235, 246–50. According to Sussman, the temporal proximity between that leave request and sharing the firing decision would allow a jury to conclude she was fired for that reason. *See* ECF No. 33 at 25–28; ECF No. 45 ¶ 1. But, as a general matter, temporal proximity alone does not create a genuine issue of material fact when the employer has shown a nonretaliatory justification for its action. *See Waggel*, 957 F.3d at 1376 ("While timing can establish a *prima facie* case of retaliation, dislodging an employer's nonretaliatory explanation as pretextual at the third step of *McDonnell Douglas* requires 'positive evidence beyond mere proximity.'" (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015))); *Durant v. District of Columbia*, 932 F. Supp. 2d 53, 74 (D.D.C. 2013) (noting that "temporal proximity alone is not enough to raise a genuine dispute of material fact over causation"); *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 283, 289 (D.D.C. 2017)

10

(concluding that "no reasonable jury could conclude Plaintiff's termination constituted interference with her right to take FMLA leave" even when the plaintiff was fired while on FMLA leave). That is especially so here, where the evidence shows that Axonius' justification was long documented, Glozman decided to fire Sussman after she said she would not need extended leave, and Sussman renewed the request for leave after the decision to fire her had already been made.

Sussman also says she has evidence that Axonius' performance-based reason for firing her was false. For this, she points to some of the positive feedback she received, including a middle rating in her final performance review; positive comments Glozman made in addition to negative ones; as well as raises and performance bonuses she received. *See* ECF No. 33 at 21–25. She also argues the evidence shows that Glozman incorrectly blamed her for a mistake. *See id.* at 24. But, while it is true Sussman received positive feedback for aspects of her performance, she does not dispute the many performance issues Axonius identified. *See Waterhouse v. District of Columbia*, 298 F.3d 989, 995 (D.C. Cir. 2002) (concluding the plaintiff "failed to establish that her employer's proffered explanation was unworthy of credence" where she "did not contravene—and in fact admitted—many of the deficiencies the defendants cited concerning her performance" (cleaned up) (quoting *Reeves*, 530 U.S. at 143)). The fact that Sussman can identify positive feedback does not create a genuine issue of material fact as to whether Axonius "honestly believes in the reasons it offers" for her termination. *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)); *see Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 507 F. Supp. 2d 93, 108 (D.D.C. 2007) (concluding that the "plaintiff cannot create a genuine issue . . . simply by contesting some portion of the defendant's account of his performance or citing certain instances in which he correctly performed the duties of his job"), *aff'd*, 548 F.3d 137 (D.C. Cir. 2008); *Khan v. Holder*, 37 F. Supp. 3d 213, 227 (D.D.C. 2014)

11

(noting that the "plaintiff's evidence purportedly demonstrating that he was in fact performing well is insufficient to show that his employer's stated reason is false"). Similarly, the fact that Axonius incorrectly faulted Sussman for something does not raise a genuine and material issue as to whether the companies honestly believed in their rationale for firing her. *George*, 407 F.3d at 415. And here there is no indication the companies even relied on that incorrect feedback in terminating her—indeed, Glozman had already recommended firing her by that time. *See* ECF No. 33-1 ¶ 243; *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 155 (D.D.C. 2013) (reasoning that a "minor mistake of fact on an issue that would not alter the outcome of a decision does not render an explanation pretextual").

Sussman also argues a jury could conclude Axonius' performance-based justification for firing her is pretext because Axonius did not put her on a performance improvement plan before firing her. ECF No. 33 at 28–29. When a company has a particular policy that it fails to follow, that "can be evidence of pretext." *Greer v. Paulson*, 505 F.3d 1306, 1319 (D.C. Cir. 2007); *see Johnson v. Wash. Metro. Area Transit Auth.*, 314 F. Supp. 3d 215, 220 (D.D.C. 2018) (considering the plaintiff's assertion that the defendant "departed from ordinary policy by not placing her on a 'Performance Improvement Plan'"); *Long*, 263 F. Supp. 3d at 286 (same). But Sussman has not raised a genuine issue as to whether Axonius had a policy of requiring performance improvement plans before firing people. Axonius' HR head testified otherwise—the company sometimes used performance improvement plans, but typically did not when there were "clearly documented performance issues." *See* ECF No. 36-1 at 28. Sussman attempts to rebut that testimony through an internal slide about coaching, which discusses "implementation of a performance improvement plan" and terminating employees when "the employee is not successful." ECF No. 33-1 ¶ 255; *see* ECF No. 33-26 at 3. But the slide does not purport to reflect company policy and, to the contrary,

surrounding slides support that the companies did not always require performance improvement plans before terminating employees for performance. *See* ECF No. 36 at 11; ECF No. 39-1 at 27–29 (listing "Termination or Performance Improvement Plan" as options for employees with performance issues). That Axonius did not put Sussman on a performance improvement plan therefore does not create a genuine and material issue of pretext. *See Johnson*, 314 F. Supp. 3d at 220 (finding no pretext where "Defendant's internal policy requires neither the offer nor the completion of a 'Performance Improvement Plan' as a precondition to demotion"); *Long*, 263 F. Supp. 3d at 286 (same).

Sussman's claims that firing her amounted to interference under the FMLA and UPLA fail for the same reasons. Axonius argues, and Sussman does not dispute, that Sussman cannot prevail on this claim if the evidence shows Axonius would have fired her regardless of her leave request. *See* ECF No. 31 at 16; *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 110 (D.D.C. 2016) (recognizing employers "can defend against an FMLA interference claim by showing that the employee would have been terminated regardless of the request for FMLA leave" (cleaned up)); *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 155 (D.D.C. 2012) (same). For the reasons explained, there is no genuine and material issue whether Axonius fired Sussman based on performance, rather than her request for leave. *See Miles v. Howard Univ.*, 83 F. Supp. 3d 105, 125 n.20 (D.D.C. 2015) (concluding, in the context of claims that termination was both retaliation and interference, that the court's analysis of the interference claim "goes hand-in-hand with its analysis of whether" the plaintiff's termination was retaliatory).[5]

---

[5]   The D.C. Circuit "has not addressed whether the *McDonnell Douglas* framework, under which the ultimate burden remains with the plaintiff, applies to an FMLA interference claim," leaving it unclear whether the employer has "the burden of proving that [the employee] would have been dismissed regardless of her request for FMLA leave." *Thomas*, 227 F. Supp. 3d at 110–11 (citation omitted). But here there is no genuine and material issue irrespective of who has that burden.

### B. No Reasonable Jury Could Find Sussman Was Fired Because She Complained About Harassment

Sussman also claims that Axonius fired her in retaliation for reporting sex discrimination and sexual harassment, in violation of Title VII (count six) and the DCHRA (count five). *See* 42 U.S.C. § 2000e–3(a) (prohibiting employer actions that "discriminate against" an employee because they have "opposed" a practice that Title VII forbids); D.C. Code § 2-1402.61(a) (making it unlawful to retaliate against anyone for engaging in activity protected by the DCHRA). These claims are also analyzed under the *McDonnell Douglas* framework. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (applying the framework to both Title VII and DCHRA claims). As above, because Axonius proffers a nonretaliatory reason for firing Sussman, "the only question is whether the employee's evidence creates a material dispute on the ultimate issue of retaliation either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jones*, 557 F.3d at 678 (cleaned up).[6]

Sussman's Title VII and DCHRA retaliation claims fail because a reasonable jury could not find on the record that has been developed that she was fired for reporting sex discrimination or sexual harassment or that Axonius' performance-based reason for firing her is pretextual. Indeed, her showing on these claims is weaker than for her FMLA and UPLA retaliation claims. Sussman argues she has created a genuine and material issue as to whether she was terminated because she "complained generally about the lack of women in promotions to leadership position"

---

[6]   Title VII retaliation claims require but-for causation, while the DCHRA requires a plaintiff to show the defendant's actions "were *motivated in substantial part* by retaliatory reasons, even if they were motivated also by legitimate business reasons." *District of Columbia v. Bryant*, 307 A.3d 443, 452 (D.C. 2024) (quoting *Propp v. Counterpart Int'l*, 39 A.3d 856, 870 (D.C. 2012)). Because the court concludes Sussman has not shown a genuine and material dispute under the DCHRA's more permissive causation standard, the distinction is not relevant here.

and reported a male employee's lewd comment in mid-2022, but she has not. ECF No. 33 at 41; *see* ECF No. 33-1 ¶¶ 154–59, 293–96.

Although Sussman points to evidence that she complained about the absence of women in leadership, courts have found that general complaints of this nature are not protected activities and therefore cannot provide the basis for a retaliation claim. *See Little v. Bondi*, No. 22-cv-1511, 2026 WL 91729, at *13 (D.D.C. Jan. 13, 2026) (concluding the plaintiff's question to leadership about diversity prioritization "reflects, at most, opposition to a general lack of diversity" and "[s]uch a complaint, standing alone, does not constitute protected activity" (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006))). And even assuming Sussman's advocacy or complaints were protected activity, she does not point to any evidence connecting them to the decision to fire her.

Similarly, although Sussman testified that a male manager from another department made a lewd and unwelcome comment to her at a company retreat and that she reported the comment to an HR employee, she does not point to any evidence that it had any relation to the decision to fire her. *See* ECF No. 33-1 ¶¶ 293–96. Although Sussman relies again on temporal proximity, that alone is generally not enough, *see Waggel*, 957 F.3d at 1376, and, here, Sussman's own evidence shows the complaint happened 8 to 9 months before she was fired—a period too long to support an inference of causation without other evidence, *see Ho v. Garland*, 106 F.4th 47, 52 (D.C. Cir. 2024) (noting "the temporal connection must be close" and "a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation," but that longer gaps of time can support an inference of causation based

15

on temporal proximity when combined with other evidence (quotation marks and citations omitted)).[7]

In light of the unrebutted evidence showing a long history of documented performance issues, and the absence of evidence showing that the relevant decisionmakers terminated Sussman because of her complaints, Axonius is entitled to summary judgment on Sussman's Title VII and DCHRA claims.[8]

### C. There Is A Genuine And Material Issue As To Whether Axonius Interfered With Sussman's UPLA Rights By Giving False Or Misleading Information And Not Providing Adequate Notice

Although the court grants Axonius summary judgment on Sussman's UPLA interference claim insofar as it is based on firing her, there is a genuine and material issue as to whether Axonius interfered with her UPLA rights when Sussman first inquired about her leave rights.

D.C. regulations say that an employer interferes with UPLA rights by giving "false or misleading information intended to interfere with an employee's ability to access paid-leave benefits, or which has the effect of interfering with an employee's ability to access paid-leave benefits" or by "[f]ailing to provide notice" of UPLA rights as required by law. D.C. Mun. Regs. tit. 4, § 1701.2(b)–(c). Here, Sussman has pointed to evidence indicating that when she first asked

---

[7]   Sussman also raises "me too" evidence as to these claims, *see* ECF No. 33 at 42–43, but it fails to create a genuine and material issue. As with her FMLA and UPLA claims, there is no evidence Glozman, the employee who decided to fire Sussman, was involved in any adverse action against the other employee who complained of sexual harassment. And the evidence shows the head of HR—the only individual connected to both incidents—was helpfully responsive to the other employee's claim. *See* ECF No. 33-1 ¶¶ 300–03; ECF No. 37 ¶¶ 300–03.

[8]   Sussman initially asserted at least some of her claims against Axonius' subsidiary, Axonius Federal Systems, on a theory of "joint" employment. ECF No. 45 ¶¶ 23–29. Courts have applied that theory to Title VII and DCHRA claims. *See Al-Saffy v. Vilsack*, 827 F.3d 85, 96–97 (D.C. Cir. 2016) (Title VII); *Nytes v. Trustify, Inc.*, 297 F. Supp. 3d 191, 204 (D.D.C. 2018) (DCHRA). It is unclear whether Sussman asserted her Title VII and DCHRA claims against the subsidiary on this basis, but in any event Sussman abandons the "joint" employment theory in her summary judgment briefing, and the court concludes she has not stated a retaliation claim under those statutes.

16

about leave options in December 2022, HR employees told her she was entitled to unpaid FMLA leave, which could be taken "intermittently." ECF No. 33-1 ¶¶ 222–24. The employees did not mention she may be entitled to paid leave under the UPLA, or provide the notice required by D.C. regulations. *See* D.C. Mun. Regs. tit. 7, § 3407. An HR employee provided information indicating no paid leave programs existed, including that "current paid leaves pertain more to primary & secondary caregivers" and that Sussman could "use PTO & sick time, if available" or unpaid FMLA leave. ECF No. 37 ¶¶ 225–27. And another HR employee followed up to confirm the same, and that "nothing was missed." *Id.* ¶ 226. Only after Sussman followed up the next month to ask for the "right information regarding family leave," did HR tell her "she was eligible to take a leave of absence intermittently with DC Paid Family Leave." *Id.* ¶¶ 231, 233. Sussman attests if Axonius had notified her of her right to paid leave under the UPLA when she first asked in December 2022, she "would have taken DC Paid Family Leave immediately." *Id.* ¶ 234. This evidence raises a genuine and material dispute as to whether Axonius interfered with her ability to access paid-leave benefits under the UPLA by providing false or misleading information, and by failing to provide notice of her rights when she inquired.

Axonius argues there is no genuine dispute of fact, pointing to a notice it sent to employees in October 2022 regarding an update to the amount of leave available under the UPLA. *See id.* ¶ 227; ECF No. 39-1 at 60; ECF No. 36 at 20. But employers must "provide the paid leave program notice to employees . . . at the time the covered employer receives direct notice from that employee that leave for a qualifying event is needed." D.C. Mun. Regs. tit. 7, § 3407.2(c). While the earlier notice may be relevant to Sussman's claim, it does not eliminate any genuine issue of fact as to whether Axonius interfered with Sussman's UPLA rights in its communications with Sussman and through its lack of notice to Sussman at the time she asked about paid leave.

17

## III.   Conclusion

For these reasons, the court grants the defendants' motion for summary judgment, ECF No. 31, in part and denies it in part. The court grants summary judgment to Axonius, Inc. and Axonius Federal Systems, LLC on Sussman's FMLA retaliation and interference claims. The court grants summary judgment to Axonius, Inc. on Sussman's Title VII claim; DCHRA claim; UPLA retaliation claim; and UPLA interference claim, insofar as it is premised on her termination. Sussman's UPLA interference claim against Axonius, Inc. shall proceed insofar as it is premised on Axonius, Inc. providing false or misleading information or failing to provide notice when she requested leave.

_____

AMIR H. ALI
United States District Judge

Date:   March 31, 2026

18